IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 10-cv-03104-DME-BNB

GLENN A. WOLLAM, and
BONNIE J. SHOENSTEIN,

Plaintiffs,

v.

WRIGHT MEDICAL GROUP, INC., a Delaware corporation,
WRIGHT MEDICAL TECHNOLOGY, INC., a Delaware corporation,
WRIGHT MEDICAL EUROPE S.A., a foreign corporation,
JOHN DOE, an individual, and
JANE DOE, an individual,

Defendants.
_____

### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

This matter arises on **Plaintiffs' Motion for Leave to File Second Amended Complaint** [Doc. # 102, filed 11/1/2011] (the "Motion to Amend"). I respectfully RECOMMEND that the Motion to Amend be GRANTED IN PART and DENIED IN PART, as follows:

GRANTED to (1) remove the John and Jane Doe defendants and the allegations directed against them and (2) correct the misspelling of the last name of plaintiff Bonnie Schoenstein; and

DENIED insofar as it seeks to assert a claim for exemplary damages.[1]

---

[1] The Motion to Amend also states as a purpose the dismissal of all claims against Dr. Daniel M. Ward, M.D. Dr. Ward already was dismissed from the case. Order [Doc. # 77, filed 8/11/2011].

I.

This is a products liability case against related entities that designed, manufactured, and distributed the artificial hip components implanted into plaintiff Glenn Wollam, which are alleged to be defective and to have failed on October 30, 2008.  The principal purpose of the Motion to Amend is to obtain leave of court to add a claim for exemplary damages.

Jurisdiction exists pursuant to 28 U.S.C. § 1332 based on diversity of citizenship.  The products liability claims arise under Colorado law.

Exemplary damages in Colorado are controlled by section 13-21-102, C.R.S., which provides in relevant part:

> (1)(a)   In all civil actions in which damages are assessed by a jury for a wrong done to the person or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages.  The amount of such reasonable exemplary damages shall not exceed an amount which is equal to the amount of the actual damages awarded to the injured party.
>
> (b)  As used in this section, "willful and wanton conduct" means conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff.
>
> (1.5)(a)   A claim for exemplary damages in an action governed by this section may not be included in any initial claim for relief.  A claim for exemplary damages in an action governed by this section may be allowed by amendment to the pleadings only after the exchange of initial disclosures pursuant to rule 26 . . . and the plaintiff establishes prima facie proof of a trial issue. . . .
> \* \* \*
> (3)   Notwithstanding the provisions of subsection (1) of this section, the court may increase any award of exemplary damages, to a sum not to exceed three times the amount of actual damages, if it is shown that:

> (a) The defendant has continued the behavior or repeated the action which is the subject of the claim against the defendant in a willful and wanton manner, either against the plaintiff or another person or persons, during the pendency of the case. . . .

II.

The Motion to Amend is tedious, and the reasons supporting the plaintiffs' request for exemplary damages are not clearly stated. The plaintiffs appear to base their claim on the following arguments:

(A) After the first fracture of a Wright Profemur Modular Neck in August 2005, Wright "did not temporarily stop distribution of these products until it figured out why that fracture occurred," Brief In Support [Doc. # 103] at pp. 9-10, and did not "notify surgeons who were implanting these devices that a failure had occurred," id. at p. 10;

(B) "Wright continues to distribute these titanium modular necks," id.;

(C) Prior to January 2005, when the "first ever fracture of a Wright Profemur Modular Neck occurred," Wright marketed the product "as having a history of going back to 1985, with as many as 50,000 of these devices having been implanted, without there ever having been reported a single failure." Id. at 8.[2] However, according to the plaintiffs:

> [T]hese modular necks, which first failed in January of 2005, are not the same design modular neck that Cremascoli had the perfect record with for over twenty years without a single failure. . . . [I]n 2001 Wright adopted a "design" change in its modular necks to provide increased range of motion. . . . [T]his design change

---

[2]The plaintiffs assert that "[i]n 1999 Wright purchased a European manufacturer of modular hips, Cremascoli Ortho Group S.A.," that had been "manufacturing an artificial hip stem with a modular neck system since 1985. Wright obtained approval to distribute the Cremascoli modular hip line by way of what is known as the 510(k) approval process with the United States Food and Drug Administration (FDA), calling the product line 'Profemur'." Brief In Support [Doc. # 103] at pp. 7-8.

3

>>altered the shape of the modular neck, changed its "geometry", and as well changed its weight and mass. . . . It is this new design of modular neck, which is experiencing the failures.

Id. at pp. 10-11;

(D) Wright promoted "these devices . . . as having the ability to withstand the forces of daily living and not fail. . . . However, . . . the testing that Wright Medical touted in its marketing in fact did not replicate the forces a hip is subjected to in daily activities, regularly three (3) to five (5) times body weight." Id. at p. 12. The plaintiffs also argue that "[a]s far back as 2005," Wright "promoted and marketed these devices [as] appropriate for persons with very physically demanding and active work, recreation, and lifestyles," id. at p. 14, and as "appropriate for large men." Id. at p. 15. However, the plaintiffs complain that Wright did not report that it "had discovered that these devices as designed were inadequate to withstand the forces expected in normal daily living," id. at pp. 15-16; and

(E) The letter issued by Wright on July 30, 2010, informing the public of "a problem with these devices" was not sent "directly to patients who received these devices." Id. at pp.16-17. In addition, "the letter discloses only six failures of its modular necks," although "Wright had notice of approximately 125 modular neck fractures." Id. at p. 17.

### III.

Glenn Wollam underwent surgery on April 16, 2005, to replace both of his hips. Scheduling Order [Doc. # 26] at p. 2. The implanted artificial hip devices "were designed, manufactured and/or distributed by the various Wright Medical defendants." Id. Three and one-half years later, on October 30, 2008, "the femoral neck of the artificial hip implanted on the right side of plaintiff Glenn Wollam suddenly fractured (broke in two)." Id. Mr. Wollam

contends "that at the time the femoral neck of his implanted device failed he had been using it in a normal and expected manner." Id.

IV.

Although the "first ever fracture of a Wright Profemur Modular Neck occurred" in January 2005, Brief In Support [Doc. # 103] at p. 9, the plaintiffs do not appear to dispute that Wright learned of that fracture on April 19, 2005, after Mr. Wollam's artificial hips were implanted. Response [Doc. # 107] at p. 5. Consequently, there is no argument that Wright's conduct prior to the implant surgery was willful and wanton giving rise to a claim for exemplary damages.

I do not agree that any of the post-surgical conduct or failures to act alleged by the plaintiffs are sufficient to state a claim for exemplary damages against the Wright defendants. To state a claim for exemplary damages, a plaintiff must demonstrate the existence of purposefully committed conduct "which the actor must have realized was dangerous" and that was done "heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff."

A.

In Miller v. Solaglas California, Inc., 870 P.2d 559 (Colo. App. 1993), the Colorado court of appeals reviewed the availability of exemplary damages in a products liability case involving injuries sustained when an automobile windshield "popped out" during a collision; the plaintiff was ejected through the windshield opening; and he was instantly rendered a quadriplegic. Id. at 562. The appellate court upheld the award of exemplary damages in the Miller case, reasoning:

> [D]efendants here did not mistakenly install only a single windshield without the use of urethane. Rather, the evidence

> reflects that defendants had nearly three decades of world-wide
> experience in the glass replacement business and deliberately
> installed windshields without urethane as a matter of policy.
> Further, it reveals that they did so despite a GMC manual requiring
> the use of urethane when replacing a windshield, despite a NAGS
> Calculator parts list and price guide indicating that urethane could
> be required in windshield installation, despite industry publications
> and conventions discussing the use of urethane, and despite
> industry safety standards requiring the use of urethane.

Id. at 569.

The court in Miller distinguished the facts presented there from those in Tri-Aspen Const. Co. v. Johnson, 714 P.2d 484 (Colo. 1986), where the Colorado Supreme Court found error in the trial court's failure to direct a verdict for the defendant on the issue of exemplary damages. In Tri-Aspen, the evidence showed a single instance where a builder failed to install a drain leading to damage to the structure of a house.[3]  See Miller, 870 P.2d at 569 (emphasizing that the Tri-Aspen case involved a failure to act in connection with the installation of a single drain). The Colorado Supreme Court found that the single instance "establishes no more than that Tri-Aspen made a mistake"; that "[c]onduct that is merely negligent . . . cannot serve as a basis for exemplary damages"; and that the evidence was insufficient to show that Tri-Aspen "acted with evil intent of wrongful motive." Tri-Aspen, 714 P.2d at 488.

---

[3]The Colorado exemplary damages statute was amended subsequent to the Tri-Aspen decision. See Cook v. Rockwell Int'l Corp., 564 F. Supp. 2d 1189, 1209 (Colo. 2008), rev'd on other grounds, 618 F.3d 1127 (10th Cir. 2010). The earlier statute allowed the award of exemplary damages upon a showing of "circumstances of fraud, malice or insult, or a wanton and reckless disregard of the injured party's rights and feelings." Id. The amended statute, which is applicable in this case, allows the award of exemplary damages where the "injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct," and defines willful and wanton conduct as "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff."

Wright's failure after the first fracture to "temporarily stop distribution of these products until it figured out why that fracture occurred" and failure to "notify surgeons who were implanting these devices that a failure had occurred," Brief In Support [Doc. # 103] at pp. 9-10, like the failure in Tri-Aspen to install a drain, at most, was negligent. The plaintiffs have made no showing that those failures to act were done "purposefully. . ., heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." Section 13-21-102(1)(b), C.R.S. To the contrary, on December 1, 2008, at a time when it was aware of 35 modular neck failures out of 130,000 units sold worldwide, Wright distributed a "Safety Alert" to health professionals alerting them to the failures and directing them to "highlighted information from our current package insert which we strongly suggest you review when considering these products for your patients." Safety Alert [Doc. # 107-7] at p. 2 of 3.

The allegations about Wright's failure to temporarily stop distribution and to notify surgeons after a single failure of a Wright artificial hip system do not show "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." Section 13-21-102(1)(b), C.R.S.

B.

The plaintiffs also argue that Wright's continued sale of "these titanium modular necks" entitles them to seek exemplary damages. The argument is made as follows:

> By the time Glenn Wollam's modular neck fractured on his right side Wright was aware of at least thirty-three (33) prior similar incidents of modular neck fractures. While the exact number of fractures to date is unknown to the plaintiffs, in discovery it was revealed that the total number of fractures is now approaching, if not already exceeding, two hundred. . . .
>
> Even though the number of failures, and the rate at which they were being reported, has continued to grow over time, . . . Wright continues to distribute these titanium modular necks. . . .

Brief In Support [Doc. # 103] at pp. 9-10.

The evidence before me establishes that the failure rate of the Wright modular necks as of November 18, 2010, was as follows:

Fracture Rate North America (US & Canada):

| | | |
|---|---|---|
| Long Neck Fractures | 1 per 183 | (0.546%) |
| <u>Short Neck Fractures</u> | <u>1 per 6,138</u> | <u>(0.016%)</u> |
| All Necks | 1 per 490 | (0.204%) |

Fracture Rate Worldwide:

| | | |
|---|---|---|
| Long Neck Failures | 129 | (0.153%) |
| Extra Long Neck Failures | 1 | (not provided) |
| Short Neck Failures | 7 | (0.006%) |
| <u>Failures Where Length Unknown</u> | <u>9</u> | (not provided) |
| Total Modular Neck Failures | 146 | (0.070%) |

Profemur Modular Neck Update [Doc. # 103-1] at pp. 3, 4, and 7 of 9.

In addition, the evidence is that Wright's failure rate is within a range that the medical community considers to be "acceptable." Response [Doc. # 107] at p. 13 (stating that "[n]otwithstanding this rate, which the medical community calls 'acceptable,' Wright Medical voluntarily initiated a [Corrective Action/Preventive Action investigation] to further investigate the reported failures"); Declaration of Christopher Brian McDaniel [Doc. # 107-2] (the

"McDaniel Decl.") at ¶4 (affirming the truth of the factual statements contained in the Response); and Deposition of Daniel M. Ward, M.D. [Doc # 107-8] ("Ward Depo.") at p. 260 line 23 through p. 261 line 17 (stating that a failure rate of 1 in 25,000 is an "acceptable mechanical failure rate").

With respect to the particular artificial hip configuration implanted in Mr. Wollam, the undisputed evidence is that there has been only one failure--that experienced by Mr. Wollam himself. Response [Doc. # 107] at pp. 13-14; McDaniel Decl. [Doc. # 107-2] at ¶4.

In the absence of some evidence indicating that the failure rate experienced by Wright's "titanium modular necks" exceeds that which is deemed acceptable by the medical community, a regulatory agency, or the like, the plaintiffs have failed to demonstrate "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff," section 13-21-102(1)(b), C.R.S. Compare Miller, 870 P.2d at 569 (finding an entitlement to exemplary damages where the defendant continued for three decades a practice that was contrary to a manufacturer's manual, an industry parts list and price guide, industry publications and conventions, and industry safety standards).

### C.

The plaintiffs also claim that they have established a prima facie showing entitling them to seek exemplary damages based on a design change to the Profemur neck. Specifically, the plaintiffs argue:

> [T]hese modular necks, which first failed in January of 2005, are not the same design modular neck that Cremascoli had the perfect record with for over twenty years without a single failure. . . . [I]n 2001 Wright adopted a "design" change in its modular necks to provide increased range of motion. . . . [T]his design change altered the shape of the modular neck, changed its "geometry", and as well changed its weight and mass. . . . It is this new design of modular neck, which is experiencing the failures.

Brief In Support [Doc. # 103] at pp. 10-11.

The evidence establishes that in December 2000, Wright obtained approval from the United States Department of Health & Human Services, Food and Drug Administration to market the "Pro-Femur R Revision Hip System." FDA Approval [Doc. # 103-10]. The approval was accomplished through what is called a Section 510(k) notification of intent to market. Id. The FDA Approval specifically notes that the FDA "determined the device is substantially equivalent (for the indications for use stated in the enclosure) to devices marketed in interstate commerce. . . ." Id.

The FDA Approval also provides that Wright "may . . . market the device, subject to the general controls of the [Federal Food, Drug, and Cosmetic] Act"; that Wright must comply "with the current Good Manufacturing Practice requirements"; and that the FDA through periodic . . . inspections . . . will verify" that compliance. Id. The plaintiffs do not contend that Wright failed to comply with these requirements.

The fact that Wright modified the Profemur modular neck, in a manner apparently consistent with all applicable requirements, does not demonstrate "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." Section 13-21-102(1)(b), C.R.S.

D.

The plaintiffs argue that they have established prima facie proof of a trial issue for exemplary damages based on Wright's representations that the Profemur modular necks have "the ability to withstand forces of daily living" and as "appropriate for persons with very physically demanding and active . . . lifestyles," Brief In Support [Doc. # 103] at pp. 12 and 14, when, in fact, the testing "did not replicate the forces a hip is subjected to in daily activities, regularly three (3) to five (5) times body weight." Id. at p. 12.[4]

The Brief In Support includes three testimonials from patients receiving Wright hip implants. The testimonials refer to patients with active lifestyles. Testimonials [Docs. ## 103-32, 103-33, and 103-34]. None of the testimonials make any specific claim about the amount of force the Profemur neck can withstand, however, or any laboratory testing performed on the hip. Nor is there any evidence that the testimonials are false and that the featured patients did not experience the results claimed. Wright's Technical Monograph [Doc. # 103-11] discloses on its face that the testing was performed "at a maximum load of 2,300 N (over 2 times a 250 lbs. body weight)." Id. at pp. 9-10.

The evidence shows that Mr. Wollam's treating physician did not rely on any of Wright's promotional literature in deciding to implant the Profemur modular neck in Mr. Wollam, Ward Depo. [Doc. # 107-8] at p. 228 line 17 through p. 229 line 24, and there is no evidence that Mr. Wollam relied on those materials. See Response [Doc. # 107] at p. 17 n. 6.

---

[4] The plaintiffs do not provide any pinpoint citations supporting their assertion that regular daily activities cause forces on the hip of three to five times body weight, although Exhibits 10 and 11 [Docs. ## 103-28 and 103-29] appear to indicate forces occurring in that range.

11

Taken as a whole, these facts do not show "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." Section 13-21-102(1)(b), C.R.S.

E.

Finally, the plaintiffs complain that Wright's letter of July 30, 2010, informing the public of a problem with the Profemur modular necks was not "sent directly to patients" who received implants and that it disclosed only six failures when Wright had notice of approximately 125 such failures. Brief In Support [Doc. # 103] at pp. 16-17.

Wright's letter of July 30, 2010, has no direct relevance to the plaintiffs. Mr. Wollam's implant surgery occurred on April 16, 2005, and the right hip fractured on October 30, 2008, both events happening years before the date of the letter.

In addition, the plaintiffs appear to misinterpret the July 30 Letter. That letter addresses "recent case studies" which resulted in published articles; it does not purport to report all modular neck fractures. July 30 Letter [Doc. # 103-36]. There is, however, a chart on the second page of the letter which indicates that more than six total modular neck fractures had occurred. In addition, in an earlier letter to "Healthcare Professional[s]" dated December 1, 2008, [Doc. # 107-7], Wright reported "35 modular neck failures as of November 21, 2008." Id.

The plaintiffs' misinterpretation of the July 30 Letter does not show "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." Section 13-21-102(1)(b), C.R.S.

V.

I respectfully RECOMMEND that the Motion to Amend [Doc. # 102] be GRANTED IN PART and DENIED IN PART as follows:

GRANTED to (1) remove the John and Jane Doe defendants and the allegations directed against them; and (2) correct the misspelling of the last name of plaintiff Bonnie Schoenstein; and

DENIED insofar as it seeks to include a claim for exemplary damages.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have 14 days after service of this recommendation to serve and file specific, written objections.  A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed. R. Civ. P. 72(b); Thomas v. Arn, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions.  Makin v. Colorado Dept. of Corrections, 183 F.3d 1205, 1210 (10th Cir. 1999); Talley v. Hesse, 91 F.3d 1411, 1412-13 (10th Cir. 1996).  A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review.  United States v. One Parcel of Real Property, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated January 3, 2012.

BY THE COURT:

 s/ Boyd N. Boland
United States Magistrate Judge